## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

ANTHONY HALL
c/o Harris St. Laurent & Wechsler LLP
1775 Pennsylvania Avenue, N.W., Suite 650
Washington, D.C. 20006
(County of Residence: Baltimore City),

       Plaintiff,

       v.                                             Case No.: 1:24-cv-1137

BALTIMORE POLICE DEPARTMENT
   Serve on: Commissioner Richard Worley
   601 East Fayette Street
   Baltimore, Maryland 21201,

DONALD LICATO
1919 Nelson Mill Road
Jarrettsville, MD 21084

FRANK BARLOW
9113 Bowline Road
Nottingham, MD 21236

and

THE ESTATE OF JOHN BARRICK
505 High Acre Dr., Apt. 318
Westminster, Maryland 21157

       Defendants.

    \*     \*     \*    ooo0ooo    \*     \*     \*

## COMPLAINT AND REQUEST FOR JURY TRIAL

Plaintiff Anthony Hall, by and through his undersigned attorneys, alleges as follows:

## INTRODUCTION

1.     In 1991, Anthony Hall was 29 years old. Born and raised in Baltimore, Maryland,

he worked as a cement mixer to support himself and his two young children. He loved dogs, his

family, and basketball—a sport at which he excelled despite his height of 5'5".

2.     On October 3, 1991, Defendants Baltimore Police Department ("BPD"), Detective Donald Licato, Detective Frank Barlow, and Sargeant John Barrick[1] irreparably changed Mr. Hall's life through intentional and unconscionable misconduct condoned by the BPD. Defendants arrested Mr. Hall and falsely accused him of the murder of Gerard Dorsey.

3.     As a result of Defendants' misconduct, Mr. Hall was detained pending trial, wrongfully convicted, served more than 25 years in prison, and then remained on parole until March 2023, when he was granted a Writ of Actual Innocence. One month later, the Baltimore City State's Attorney's Office ("SAO") dismissed the charges against him.

4.     Mr. Hall's wrongful conviction was the direct and proximate result of Defendants' unlawful and unconstitutional conduct to compel the only two non-police witnesses—Nancy Hill and Gerald Patterson—to falsely testify against Mr. Hall at his criminal trial.

5.     Mr. Hall's criminal trial lasted only two days with just four witnesses: a single officer who testified about the location of Mr. Dorsey's body; Defendant Barrick who testified falsely; and Ms. Hill and Mr. Patterson, whose false testimony was coerced through threats and intimidation.

6.     No physical evidence tied Mr. Hall to the murder. No inculpatory statement from Mr. Hall existed. No motive. The evidence forming the basis of Mr. Hall's conviction was solely that of two coerced witnesses and Defendant Barrick's perjury.

7.     Both Ms. Hill and Mr. Patterson have since acknowledged under oath that the Officer Defendants coerced their false testimony. As explained below, the Officer Defendants

---

[1] John Barrick passed away on November 4, 2023. *See* Dignity Memorial, *Obituary, John Edward Barrick*, https://www.dignitymemorial.com/obituaries/cape-coral-fl/john-barrick-11527268. Although Mr. Hall brings this lawsuit against the Estate of John Barrick, he refers to Defendant Barrick throughout in his individual capacity. Mr. Hall refers to the individual Defendants Licato, Barlow, and Barrick collectively throughout this Complaint as "Officer Defendants."

threatened to take Ms. Hill's children from her and threatened Mr. Patterson with a prison sentence, on an unrelated criminal charge, if they did not falsely implicate Mr. Hall in Mr. Dorsey's murder. The Officer Defendants engaged in this misconduct, despite Ms. Hill repeatedly telling them she could not identify the murderer and Mr. Patterson repeatedly saying he was not at the scene when the shooting occurred.

8.     Defendants knew Ms. Hill's and Mr. Patterson's testimony was coerced and false, yet they failed to disclose this, as well as other exculpatory and impeachment statements, to the SAO and Mr. Hall's defense attorney. For example, Defendants suppressed the following statements from Mr. Patterson explaining that he did not see the murder and did not know who killed Gerard Patterson:

(Excerpts of BPD Notes by Det. Licato from July 15, 1991 Interview of Gerald Patterson)

9.     Defendants also suppressed multiple statements from various eyewitnesses who described the perpetrators in a manner that excluded Mr. Hall or were evidence of Mr. Hall's innocence.

10.    Moreover, Defendant Barrick testified falsely at trial that there were only two eyewitnesses to the shooting (Ms. Hill and Mr. Patterson) knowing that Defendants had not

disclosed to Mr. Hall's defense attorney that Ms. Hill could not identify the perpetrators, Mr. Patterson was not an eyewitness at all, and that there were other eyewitnesses who either directly excluded Mr. Hall or gave descriptions of the perpetrators that excluded him.

11.     Had the exculpatory information been disclosed, either the SAO would have dismissed the case against Mr. Hall or the jury would have acquitted.

12.     As a result of Defendants' egregious misconduct, a Baltimore city jury wrongly convicted Mr. Hall on April 30, 1992, of second-degree murder and the use of a handgun in the commission of a crime of violence. Mr. Hall served more than 25 years in prison, followed by six years on parole.

13.     Mr. Hall always maintained his innocence and filed multiple post-conviction applications to no avail. None of the withheld exculpatory or impeachment evidence was produced by Defendant BPD or the Officer Defendants in any of the post-conviction proceedings.

14.     In 2004, at Mr. Hall's request, the Mid-Atlantic Innocence Project ("MAIP") reinvestigated Mr. Hall's conviction and, based on newly discovered evidence, filed a Petition for a Writ of Actual Innocence in June 2021 that Mr. Hall amended in February 2023.

15.     After an evidentiary hearing on March 8, 2023, the Circuit Court for Baltimore City granted Mr. Hall's Petition, vacated the conviction, and ordered a new trial. As the judge who issued the Writ of Actual Innocence noted, the evidence against Mr. Hall at trial was "hardly overwhelming" and the trial testimony of Mr. Patterson had now been "eviscerated."

16.     On April 18, 2023, the SAO dismissed the case.

17.     On June 30, 2023, Mr. Hall, filed a petition with the State of Maryland Office of Administrative Hearings ("OAH") pursuant to the Walter Lomax Act, seeking compensation for the time he served in prison as a result of his wrongful conviction. After an evidentiary hearing—

at which the SAO offered no evidence against Mr. Hall—an Administrative Law Judge ("ALJ") concluded that Mr. Hall's conviction was secured by Defendants' coercion and misconduct to force Ms. Hill and Mr. Patterson to falsely incriminate him for Mr. Dorsey's murder.

18.     The ALJ found: "There is no evidence tying [Mr. Hall] to the murder of Mr. Dorsey and it was only through manipulation of the witnesses and hiding evidence that the City obtained a conviction in the first place."

19.     The police misconduct in this case is just another entry in the long list of Defendant BPD's pattern and practice of wrongdoing during homicide investigations. As detailed more fully below, there is a long and proven history of withholding exculpatory and impeachment evidence, coercing and threating witnesses to give false statements and testimony, fabricating evidence, giving false testimony, and failing to conduct meaningful investigations.

20.     Defendants placed Mr. Hall in a cage—for 25 years—for a crime he did not commit. The pain they caused him is substantial. Thankfully, the law provides him a remedy.

## JURISDICTION AND VENUE

21.     This action is brought under 42 U.S.C. § 1983 and Maryland tort law.

22.     This Court has both federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367.

23.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

24.     On February 21, 2024, undersigned counsel sent the City Solicitor for Baltimore City notice of Plaintiff's claims per the Maryland Local Government Tort Claims Act.

25.     The City of Baltimore has not responded.

26.     On February 21, 2024, undersigned counsel sent the Treasurer of the State of Maryland notice of Plaintiff's claims.

27.     The State denied Mr. Hall's claims by letter dated February 29, 2024.

## PARTIES

28.     Plaintiff Anthony Hall is an individual residing in Baltimore, Maryland, and, at all times relevant to this Complaint, was a citizen and resident of the State of Maryland.

29.     At all times relevant to this Complaint, the Officer Defendants were employees of BPD, acting under the color of state law and within the scope of their employment under the statutes, ordinances, regulations, polices, customs, practices and usage of the BPD. Mr. Hall sues the Officer Defendants in their individual capacities.

30.     Defendant BPD employed the Officer Defendants at all times relevant to this suit and is a "person" within the meaning of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

### A.     Anthony Hall's Life Before His 25 Years of Wrongful Incarceration

31.     Anthony Hall was born in Baltimore, Maryland, on September 20, 1962. Raised in Baltimore, he started working as a youth to support himself, participating in a summer jobs program in high school to afford school clothes and later as a dishwasher and a janitor at a local phone company.

32.     In 1991, Mr. Hall worked at Laurel Construction mixing and laying cement to support his two young children, his son, Demetris, and daughter, Avonrea.

33.     While only 5'5", Mr. Hall loved and excelled at basketball, with friends from the neighborhood describing him as being "good for a short guy."

34.     Mr. Hall was close to his family, particularly his children, his younger sister, and his mother, and had no criminal history of violence.

35.     Mr. Hall's life changed on October 3, 1991, when he was arrested for Mr. Dorsey's murder—a murder he did not commit.

**B.      BPD's Homicide Investigation of the Gerard Dorsey Murder**

36.      On July 13, 1991, at approximately 10:30 p.m., Gerard Dorsey was shot and killed on the 600 block of North Brice Street in Baltimore City, Maryland. BPD Officer Bruce Button discovered Mr. Dorsey's body around 10:40 p.m.

37.      Defendant Barrick was the lead homicide detective and supervisor on the case. Defendants Licato and Barlow, both detectives, actively investigated the case, participating in almost every witness interview and report.

38.      As the direct supervisor of the investigation, Defendant Barrick had responsibility to provide leadership and to review all witness statements taken by detectives.

39.      The Officer Defendants worked collaboratively during the investigation and shared information with one another as it was gathered.

40.      On July 14, 1991, as part of the BPD's ongoing investigation into Mr. Dorsey's murder, BPD Sgt. Ronald Lamartina, Defendant Barlow, and Defendant Licato transported and interviewed Sylvester Manning.[2] Mr. Manning told the police he was present near the corner of Edmonson Avenue and Brice Street on July 13, 1991, where he saw a man chasing another man and shooting at him. Mr. Manning described four to five shots, after which he observed what later turned out to be Dorsey collapse on the corner of Brice and Edmondson.

41.      Mr. Manning described the shooter as around 6' tall, weighing 190 lbs., and wearing a blue baseball hat and jeans. Defendants withheld and otherwise failed to disclose the police report memorializing Mr. Manning's statements—which directly contrasted with Mr. Hall's 5'5" stature—to the SAO or Mr. Hall's criminal defense attorney.

---

[2] According to a LexisNexis search, Mr. Manning has been deceased since 2010.

42.     On July 15, 1991, two days after the shooting, Defendant Licato interviewed Gerald Patterson. Defendant Licato memorialized his interview in a report sent to Defendant Barrick.

43.     Mr. Patterson knew Mr. Dorsey for approximately six years from selling drugs in the area of Payson Street, Edmondson Avenue, and Brice Street. Two days before the shooting, on July 11, 1991, at nighttime, two men approached Mr. Patterson and asked if he had seen Mr. Dorsey. Mr. Patterson responded no, and around the same time observed Mr. Dorsey run into a nearby home after seeing the two men approach Mr. Patterson. Mr. Patterson did not see Mr. Dorsey again until July 13, 1991, approximately four hours before Mr. Dorsey was shot.

44.     On July 13, 1991, Mr. Patterson spoke with Mr. Dorsey and asked him about the two men. Mr. Dorsey was evasive and did not respond. Mr. Patterson then went to the movies with his brother, Edward Patterson, and his brother's girlfriend, Deborah Saunders, around 7:30 p.m. and returned to the area hours later after the murder. Mr. Patterson told Defendant Licato that he did *not know* who killed Mr. Dorsey.

45.     Mr. Patterson said that Mr. Dorsey had been "burning" people for drugs for about two weeks. An individual named Tyrone told Mr. Patterson that he (Tyrone) had seen the shooter and Mr. Dorsey arguing about drugs near a local restaurant, Jay's Carry Out. Mr. Patterson reiterated that he did not know who killed Mr. Dorsey. Defendants withheld and otherwise failed to disclose the information Mr. Patterson provided to them to the SAO or Mr. Hall's criminal defense attorney, including that Mr. Patterson did not know the identity of Mr. Dorsey's killer.

46.     Days after Mr. Dorsey's shooting, members of the BPD spoke with Ms. Saunders at her place of employment. Consistent with Mr. Patterson's statement, Ms. Saunders said she was with Gerald Patterson and Edward Patterson on the night of Mr. Dorsey's shooting and returned from the movies after the shooting. She confirmed that she, Gerald, and Edward did not see the

shooting, did not hear any gunshots, and did not see anyone running from the scene. Members of the BPD failed to take any notes of their conversation with Ms. Saunders and failed to write a report memorializing her statement or disclose the substance of Ms. Saunders' statement to the SAO or Mr. Hall's criminal defense attorney.

47.     On July 22, 1991, Defendant Licato interviewed Vivian Williams at BPD headquarters. Defendant Licato signed Ms. Williams's interview notes, and Defendants Licato and Barlow authored a subsequent report memorializing Ms. Williams's interview.

48.     According to the report, Ms. Williams knew Mr. Dorsey and saw him while driving with a friend, Rhonda Lisa Jones, on the night he was killed. Ms. Jones was driving her car, with Ms. Williams in the passenger side, near Brice and Edmonson when they spoke to Mr. Dorsey while he was on foot. As he walked behind the car, Ms. Williams saw two men approach.

49.     Ms. Williams stated that both men were "tall": one was "tall thin, light brown skinned" wearing a purple sweatsuit; the other as 6'1" with medium brown skin wearing a flat, wide herringbone gold chain. Both descriptions contrast with Mr. Hall, who is 5'5".

(Excerpt of BPD Notes by Det. Licato from July 22, 1991 Interview of Vivian Williams)

50.     Ms. Williams saw the two men grab Mr. Dorsey and the man in purple pull a gun from his waistband. Mr. Dorsey tried to enter Ms. Jones's car, the man in purple started shooting, and Ms. Jones pulled away. Ms. Williams heard 9 to 10 shots, which sounded like two guns.

51.     Ms. Williams and Ms. Jones circled the block and returned to see police and an ambulance. Ms. Williams called Mr. Dorsey's family, told them he was killed, and said she saw it happen.

52.     Defendants withheld and otherwise failed to disclose to the SAO or Mr. Hall's criminal defense attorney the information contained in the July 22, 1991 report, including that Ms. Williams was an eyewitness and her physical descriptions of the perpetrators excluding Mr. Hall.

53.     On July 23, 1991, Defendant Licato and Det. James Hagin interviewed Rhonda Lisa Jones. According to the report from Ms. Jones's interview, Ms. Jones was driving her car with Ms. Williams in the passenger seat, saw Mr. Dorsey at Edmondson and Brice, and, after Ms. Williams said "look, look," Ms. Jones heard approximately 8 gun shots and drove away. Ms. Jones confirmed that she did not personally see the shooting, but that Ms. Williams did. Defendants withheld and otherwise failed to disclose to the SAO or Mr. Hall's criminal defense attorney the police report of Ms. Jones's statement signed by Defendants Licato and Barrick.

54.     On August 22, 1991, Defendants Barrick and Licato interviewed Gerald Patterson for a second time at the BPD police station—this time approximately two weeks after Mr. Patterson had been arrested on a heroin charge. Mr. Patterson again said that on July 13, 1991, he was with Edward Patterson and Ms. Saunders in a car at Payson and Edmondson *after* Mr. Dorsey was shot. Mr. Patterson was in the backseat but claimed he saw three men run in front of the car, one with a large handgun and wearing dark sweatpants, another wearing a black and white short set, and the

third wearing a red and white striped short set. He observed the three men get into a vehicle and leave.

55.     Mr. Patterson informed Defendants Barrick and Licato that a witness named Tyrone was at the scene. According to Mr. Patterson, Tyrone heard a conversation between the victim and one of the three men. Mr. Patterson showed Defendants Barrick and Licato Tyrone's house and said Tyrone was an eyewitness to the murder.

56.     Mr. Patterson also disclosed to Defendants Barrick and Licato that he had heard and told Mr. Dorsey's family that someone named "Marvin" was the shooter.[3]

57.     Defendants withheld and otherwise failed to disclose to the SAO or Mr. Hall's criminal defense attorney the report and notes from Mr. Patterson's second interview.

58.     On August 26, 1991, Defendants Licato and Barrick interviewed Richard Covington. Mr. Covington reported to Defendants Licato and Barrick that: he knew Mr. Dorsey from selling "burn bags" of drugs; on the night before Mr. Dorsey was murdered three men were in the area looking for him; and he warned Mr. Dorsey that someone was likely going to hurt him.

59.     Mr. Covington explained that while he was not present when the shooting occurred, he was walking around the neighborhood later that night and spoke with a woman nicknamed "Little Bit" who pointed out a man sitting on some nearby steps that she said was bragging about shooting Dorsey. Mr. Covington later overheard the man say he committed the murder to two men who arrived while he was speaking with Little Bit.

60.     Mr. Covington recognized the man as "Martin" from the corner of Brice and Edmondson where "Martin" sold drugs and described him as 24-26 years old, weighing 175

---

[3] Defendants had interviewed two other witnesses, Connie Nash and Mr. Dorsey's mother, Jean Dorsey, each of whom had said they had heard that Mr. Dorsey had been murdered by someone named Marvin.

pounds, and being between 5'10" and 6' tall. Mr. Covington further stated that "Martin" drove a black Firebird, wore a gold herringbone necklace, and had a gold front tooth. Mr. Covington also confirmed that Tyrone Rice was with Mr. Dorsey on the night of the murder.

61.     Defendants withheld and otherwise failed to disclose to the SAO or Mr. Hall's criminal defense attorney information contained in Mr. Covington's statement, including that the shooter was not Mr. Hall and that Tyrone Rice was an eyewitness to Mr. Dorsey's shooting.

62.     On August 30, 1991, Defendant Licato interviewed Tyrone Rice. Mr. Rice said that on the night of the murder, he was standing next to Mr. Dorsey and Gina Banks around 10:30 p.m. at Jay's Carry Out when two men pulled up and got out of a dark car.

63.     Mr. Rice described one man as being 5'8", weighing 150-160 pounds, wearing a black tank top and shorts, and having a gun. The second man was about 6'1" tall, wearing a tank top, shorts, and rings, who also had a gun. Mr. Rice told Defendant Licato that he recognized the first man but did not know his name.

64.     Mr. Rice said that the first man fired a shot, prompting Mr. Dorsey to turn and run up Edmondson Avenue. Mr. Rice then ran into Jay's Carry Out, where he heard more shots.

65.     According to Mr. Rice, earlier that week, a man approached him and Tony Matthews and accused Mr. Matthews of selling bad drugs. Mr. Matthews responded that the drugs were Mr. Dorsey's, and Mr. Matthews left with the man. Mr. Rice went home.

66.     Mr. Rice also told police that he had seen the man two or three times before the murder and the man bought drugs in the area.

67.     A report memorializing Mr. Rice's statement was later authored and signed by Defendants Barrick and Licato. Defendants withheld and otherwise failed to disclose to the SAO

or Mr. Hall's criminal defense attorney information contained in Mr. Rice's statement, including that he was an eyewitness to Mr. Dorsey's shooting and the shooter was not Mr. Hall.

68.     On September 12, 1991, Defendant Barrick interviewed Antonio "Tony" Matthews. Mr. Matthews confirmed that a man approached him and Mr. Rice and accused Mr. Matthews of selling bad drugs in the days leading up to Mr. Dorsey's murder. Defendants withheld and otherwise failed to disclose the police report memorializing Mr. Matthew's statements identifying someone other than Mr. Hall as having a motive to kill Mr. Dorsey.

69.     On September 24, 1991, more than two months after the murder, Defendants Licato and Barlow went to Nancy Hill's great-grandparents' home and told her to go with them to the Homicide Department, where they interviewed her for the first time. Ms. Hill asked that her great-grandfather be permitted to go with her; Defendants Licato and Barlow refused.

70.     Defendants Licato and Barlow told Ms. Hill that she would be able to pick up her children later that day; instead, they kept her for hours.

71.     Ms. Hill explained that on the night of the murder, she was walking near Edmonson Avenue and Brice Street with her five children when a man ran past her while being chased by two men, knocking her two-year old daughter over. Ms. Hill repeatedly said she could not identify the man being chased or the two men chasing him.

72.     Refusing to accept Ms. Hill's repeated statements, Defendants Licato and Barlow began pounding on the table, accusing Ms. Hill of lying and telling her that they knew she had seen something.

73.     Rather than release Ms. Hill, Defendants Licato and Barlow proceeded to intimidate and coerce her until she was forced to inculpate Mr. Hall. Among other things, Defendants Licato and Barlow—both armed at the time—fed Ms. Hill Mr. Dorsey's name, threatened to charge her

with obstruction and other false criminal offenses if she did not identify Mr. Hall, and told her she would lose custody of her children if she did not cooperate and adopt their fictitious narrative.

74.     Defendants Licato and Barlow showed Ms. Hill books of photographs containing various photos. In response, Ms. Hill identified a single person—Anthony Hall—who she knew from the neighborhood, but again confirmed that she did not see him on the night of the murder.

75.     Defendants Licato and Barlow doubled down, placing a photo of Mr. Hall in a six-photograph lineup and again asking Ms. Hill to identify the perpetrator. Again, she said she knew Mr. Hall from the neighborhood, but that she did not see him on the night of the murder.

76.     After hours of interrogation and having been brought to tears fearing that she would lose her children, Ms. Hill acquiesced and told the Officer Defendants what they wanted to hear—that she saw Mr. Hall run by her before she heard gunshots killing Mr. Dorsey.

77.     Ms. Hill further falsely described the shooter as Mr. Hall and as being approximately 5'6 feet tall and 140 pounds, with a neatly trimmed beard, wearing a black T-shirt and black pants with white stripes on the side.

78.     Due to the Officer Defendants' coercion, Ms. Hill falsely identified Mr. Hall from a photograph array.

79.     Defendants fabricated two reports: one of the interview of Ms. Hill with her description of the perpetrator she supposedly believed to be Mr. Hall and a second of her identification of Mr. Hall from the array.

80.     To conceal their misconduct, however, Defendants disclosed only the identification report to the SAO and Mr. Hall's defense attorney.

81.     Ms. Hill's description of the perpetrators at trial differed from her description when interviewed by the police.

82. The next day, on September 25, 1991, Defendants Licato and Barrick interviewed Gerald Patterson for a third time at BPD headquarters. They showed him a photograph lineup with six photos, including a photo of Mr. Hall.

83. Despite having previously informed Defendants that he did not see the shooting and could not identify anyone involved, Mr. Patterson's third statement suddenly identified Mr. Hall as one of the perpetrators. The report alleges that Mr. Patterson did not know Mr. Hall's name but said he had seen him several times in the area.

84. Mr. Patterson's third statement was the product of coercion by Defendants Licato and Barrick, who threatened him with a prison sentence for an unrelated drug charge if he did not testify falsely that Mr. Hall was the perpetrator.

85. Defendants concealed the reports from their previous interviews of Mr. Patterson and disclosed only the report from the September 25, 1991, interview inculpating Mr. Hall, depriving Mr. Hall of the ability to confront Mr. Patterson at trial with the inconsistencies between his earlier statements and his trial testimony.

86. Moreover, Defendants concealed that they threatened Mr. Patterson with prison time on his heroin charge, coercing him into falsely identifying Mr. Hall and depriving him of the ability to impeach Mr. Patterson at trial and call into question the integrity of BPD's investigation.

87. The Officer Defendants knew or had reason to know that Ms. Hill and Gerald Patterson had not and could not make a truthful, accurate, or reliable eyewitness identification of the perpetrators.

88. The Officer Defendants conspired with one another to conceal their coercion, suggestion, and fabrication of the statements and identifications. The Officer Defendants never

disclosed to the prosecution or Plaintiff's defense counsel (before, during, or after trial) that they had coerced and fabricated witness statements and identifications.

89.     The Officer Defendants failed to disclose, among other things, their threats and suggestive tactics.

90.     Plaintiff's defense counsel was thus deprived of key material to exculpate Mr. Hall, impeach the credibility of the witnesses at trial, and to impeach the Officer Defendants' account of their investigation, including Defendant Barrick's testimony at trial.

### C.     Defendants Arrested and Wrongly Accused Mr. Hall

91.     On September 26, 1991, Mr. Hall was charged, and an arrest warrant was obtained. Defendant Licato and BPD Lieutenant Robert Stanton signed Mr. Hall's arrest warrant based on a statement of facts provided by Defendant Licato. Defendants Barlow and Licato are identified in the warrant information as the C.I.D. Investigators on scene. The statement of facts falsely claims that there were only two eyewitnesses (i.e., Ms. Hill and Mr. Patterson).

92.     Moreover, the warrant lists Mr. Hall's height as 5'5", inconsistent with multiple eyewitness statements identifying the perpetrators as being much taller than Mr. Hall.

93.     The witness interviews did not provide the Officer Defendants with a legitimate basis to arrest and seek the prosecution of Mr. Hall and no physical evidence linked Mr. Hall to the murder.

94.     On October 3, 1991, Defendant Licato and BPD Detective John Burns interviewed Mr. Hall. They noted that he was 5'5" tall and 130 pounds.

95.     Mr. Hall stated he was not involved in Mr. Dorsey's shooting and that he was on Raynor Ave. between Payson and Pulaski at the time that Mr. Dorsey was shot and killed. He told the detectives he was with Mario Moring and another individual named "Ricky" on the night of the murder and that he was wearing shorts and a red and white top.

16

96.     The SAO presented to a grand jury on September 24 and 26, 1991. The SAO's case against Mr. Hall was tainted by Ms. Hill's and Mr. Patterson's coerced statements, intentional misrepresentations that there were only two eyewitnesses, and the intentional failure to present the various exculpatory identifications and statements.[4]

97.     On September 26, 1991, Mr. Hall was wrongly charged with the murder of Mr. Dorsey. As a result of the intentional misconduct outlined above, Mr. Hall was detained pending trial.

98.     On October 21, 1991, members of Defendant BPD spoke to Mr. Rice again. Mr. Rice told the police that he knew Mr. Hall personally, that Mr. Hall was not the shooter, and that he did not see Mr. Hall on the night of Mr. Dorsey's murder. Though the police notes from this interview with Mr. Rice are initialed in illegible handwriting, these notes and reports demonstrate that Mr. Rice was an eyewitness and that Mr. Rice excluded Mr. Hall as having been one of the perpetrators. Nevertheless, Defendants withheld and otherwise failed to disclose Mr. Rice's October 21, 1991 statement to the SAO and Mr. Hall's defense attorney.

(Excerpt of BPD Notes from Oct. 21, 1991 Interview of Tyrone Rice)

---

[4] The State did not produce any of the grand jury testimony for Mr. Hall's Writ of Actual Innocence hearing, despite being requested to do so.

**D.      Defendants Failed to Disclose Exculpatory and Impeachment Evidence to the SAO**

99.      Prior to trial, Assistant State's Attorney ("ASA") Ilene Nathan attested that she had made all required disclosures and complied with Rule 4-263 of the Maryland Rules of Criminal Procedure and produced "any information known to the State which tends to negate the guilt."

100.      In reality, the disclosures she provided did not include:

a.      Statement to Police from Gerald Patterson from his initial interview on July 15, 1991;

b.      Statement to Police from Gerald Patterson on Aug. 22, 1991;

c.      Police notes regarding a Statement from Gerald Patterson on Aug. 22, 1991;

d.      Statement to Police from Debra Saunders that she was with Mr. Patterson on the evening of Mr. Dorsey's shooting, that they did not arrive at the scene until after the police had arrived, and that they did not see the shooters;

e.      Statement to Police from Tyrone Rice on Aug. 30, 1991;

f.      Statement to Police from Tyrone Rice on Oct. 21, 1991;

g.      Statement to Police from Sylvester Manning on July 14, 1991;

h.      Statement to Police from Vivian Williams on July 22, 1991;

i.      Statement to Police from Nancy Hill on Sept. 24, 1991;

j.      Repeated statements of Ms. Hill to the BPD that she could not identify either individual she saw chasing Mr. Dorsey;

k.      Statement to Police from Connie Nash on Aug. 12, 1991;

l.      Statement to Police from Richard Covington on Aug. 26, 1991;

m.      Statement to Police from Jean Dorsey on Aug. 19, 1991;

n.      Statement to Police from Rhonda Lisa Jones on July 23, 1991;

o.      Police Notes regarding interview of Carletta Smith on Aug. 29, 1991; and

p.      Information about the police's coercive threats used to get Mr. Patterson and Ms. Hill to change their respective statements and testify falsely.

101.      Had Defendants disclosed the materials listed in the preceding paragraph to the SAO, it would have disclosed them to Mr. Hall.

### E.     A Jury Wrongly Convicted Mr. Hall

102.    Mr. Hall's criminal trial started on April 29, 1992, in the Circuit Court for Baltimore City. The trial lasted two days.

103.    The SAO called four witnesses: Officer Button, Defendant Sergeant Barrick, Nancy Hill, and Gerald Patterson.

104.    In the months leading up to Mr. Hall's criminal trial, Defendants continued to pressure and coerce Mr. Patterson and Ms. Hill to testify against Mr. Hall.

105.    For example, the Officer Defendants picked Ms. Hill up from her home and took her to Court on the day she testified. When Ms. Hill told Defendants that she did not want to testify, they threatened to call Child Protective Services, take her children away, and lock her up.

106.    Mr. Patterson attempted to evade the Officer Defendants prior to Mr. Hall's criminal trial, causing the Officer Defendants to harass his father, who had worked at the Baltimore City jail. The Officer Defendants made multiple stops at Mr. Patterson's father's and grandmother's homes looking for Mr. Patterson and, on the day of his testimony, Defendants brought Mr. Patterson to the courthouse, placed him in a small room, and threatened to charge him with drug-related crimes if he did not give the false testimony they rehearsed with him.

107.    With no credible physical or documentary evidence, the case rested on false and coerced witness testimony.

108.    BPD Officer Button's testimony was limited to the fact that he discovered Mr. Dorsey's body around 10:40 p.m. in front of 539 Brice Street close to the east-west alley connecting Brice with Payson.

109.    Defendant Barrick, the lead detective and supervisor, falsely testified that Mr. Patterson and Ms. Hill were the only eyewitnesses.

110.    He did not tell the jury that Mr. Patterson was not actually an eyewitness, that Ms. Hill could not actually identify the perpetrators, and that Sylvester Manning, Tyrone Rice, and Vivian Williams were eyewitnesses who had previously either told Defendants that Mr. Hall was not involved and/or given the police descriptions of the shooter that excluded Mr. Hall.

111.    Defendant Barrick omitted that Mr. Patterson was arrested for heroin possession and that the Officer Defendants threatened him with a prison sentence on that charge to coerce his testimony.

112.    Under threat of incarceration, Mr. Patterson testified to the false narrative that the Officer Defendants rehearsed with him, stating that on the evening of July 13, 1991, he was in his brother's truck with his brother and his brother's girlfriend on the way back from a movie when they stopped at the corner of Edmondson and Payson, heard shots, and saw three men run past the truck, one of whom was carrying a gun.

113.    Mr. Patterson identified Mr. Hall as being one of the three men with a gun, and that Mr. Hall was wearing dark clothing, despite not being present when the murder occurred and having seen no one running from the scene with a gun.

114.    Mr. Patterson's trial testimony was inconsistent with his initial statements to the police that were not disclosed to Mr. Hall.

115.    Finally, Ms. Hill, facing mounting pressure from Defendants and under the threat of losing her children, testified that on the night of Mr. Dorsey's shooting, she was walking around 10:30 p.m. near the Edmonson and Brice with her five children. She said Mr. Dorsey ran past them and knocked down her two-year old daughter. While she was bending down to pick up her daughter, she saw two men chase Mr. Dorsey into an alley, one of whom was wearing a purple and orange sweatsuit and the other who was wearing a black hoodie covering his head.

116.    Ms. Hill falsely testified that she recognized Mr. Hall as one of the men chasing Mr. Dorsey with a gun.

117.    Ms. Hill also testified that Defendants Licato and Barrick interviewed her after the shooting, showed her a photo array, and that she positively identified Mr. Hall as being the person she saw on the night of Mr. Dorsey's murder—without any mention of the police coercion that forced her to adopt that false statement.

118.    After less than five hours of trial time over two days, a jury convicted Mr. Hall of second-degree murder and the use of a handgun in the commission of a felony.

119.    Mr. Hall received a 30-year sentence. He served over 25 years in prison and was still on parole at the time the Writ of Actual Innocence was issued.

120.    Mr. Hall filed numerous motions for post-conviction relief during his 25 years in prison. At the time the motions were filed, he was unaware of the exculpatory material described above.

121.    Defendants failed to disclose the above-mentioned exculpatory and impeachment materials during Mr. Hall's post-conviction proceedings.

122.    Each of Mr. Hall's post-conviction motions was denied.

**F.    MAIP's Investigation Uncovers Evidence of Defendants' Misconduct**

123.    In 2004, at Mr. Hall's request, the MAIP began investigating his conviction and obtained, through Maryland public records requests, documents containing exculpatory and impeachment evidence that had been withheld.

124.    The records MAIP obtained revealed that Defendant BPD failed to disclose Ms. Hill's and Mr. Patterson's statements that were inconsistent with their trial testimony, which demonstrated that Defendant Barrick testified falsely at trial.

125.    Edward Patterson, and his then-girlfriend, Ms. Saunders, corroborated Mr. Patterson's initial—and undisclosed—police interview, in which he told the BPD they were together, did not arrive at the scene until after the police, and saw no one with a gun or anyone involved in the shooting.

126.    Ms. Saunders confirmed that she had given this information to the police just days after the murder; yet members of the BPD did not take notes or memorialize her statement.

127.    Gerald Patterson also detailed the pressure that the Officer Defendants placed on him in 1991 to falsely testify against Mr. Hall, including that his father worked at a jail and that his father was harassed and forced to pressure Mr. Patterson to cooperate and testify against Mr. Hall.

128.    Mr. Patterson confirmed that the police were already at the scene by the time he arrived.

129.    Mr. Patterson also explained that while he used drugs at the time of Mr. Hall's criminal investigation and trial, he has been sober for the past 26 years.

130.    Mr. Patterson also stated that members of the BPD arrested him at some point after the night of the shooting for possession of heroin, took him to the station, left him in a room for 20 to 30 minutes, and then told him that he was going to jail for drugs if he did not identify Mr. Hall as Mr. Dorsey's shooter.

131.    Mr. Patterson confirmed that he never told the police he saw Mr. Hall that night or that he saw Mr. Hall with a gun until after they threatened him with a prison sentence on an unrelated drug charge.

132.    Mr. Patterson said the police had already drafted a statement for him to sign before he was even questioned and that he signed the statement under pressure and threat of prosecution.

133.     Mr. Patterson said the police showed him a photo array and the officer used his thumb to indicate which photo he should identify.

**G.      Mr. Hall Is Exonerated After 25 Years in Prison**

134.     On June 11, 2021, Mr. Hall filed a Petition for Writ of Actual Innocence, and subsequently amended his petition on February 15, 2023, based on exculpatory and impeachment materials identified above that Defendants concealed from him before, during, and after his trial.

135.     An evidentiary hearing was held on March 8, 2023. At the hearing, counsel for the State agreed with Mr. Hall on the record that "the State also has no indication that" the exculpatory and impeachment evidence identified in Mr. Hall's Petition "were disclosed."

136.     At the hearing, the State represented that Ms. Hill was deceased, which was false.

137.     The court heard live testimony from Gerald Patterson, Ms. Saunders, and Ms. Williams and considered voluminous documentary evidence.

138.     On March 15, 2023, the Circuit Court for Baltimore City granted Mr. Hall's Petition for a Writ of Actual Innocence, vacated the convictions, and ordered a new trial.

139.     Among other things, the court concluded that the evidence that had convicted Mr. Hall was "hardly overwhelming," noting the lack of any forensic evidence tying Mr. Hall to the crime scene or any inculpatory statements from Mr. Hall.

140.     The court further concluded that Mr. Patterson's trial testimony had been "eviscerated," in part due to the State's concession that had the jury learned of Mr. Patterson's prior inconsistent statements that were not disclosed to Mr. Hall, "the jury would have entirely discounted Gerald Patterson's trial testimony."

141.     The court also credited the wealth of affirmative evidence of Mr. Hall's innocence that had not been disclosed before the criminal trial, including the statements of Rice, Williams,

and Manning "who specifically eliminated the Petitioner [Mr. Hall] as the perpetrator, as well as other witnesses who gave descriptions of the shooter that did not fit the Petitioner."

142.    The circuit court concluded that Mr. Hall had "produced significant evidence that he was wrongfully identified as the perpetrator and further that he affirmatively was not the perpetrator."

143.    On April 18, 2023, the State of Maryland dismissed the case against Mr. Hall.

144.    Mr. Hall filed a petition with OAH for compensation under the Walter Lomax Act.

145.    At the OAH Walter Lomax evidentiary hearing, Mr. Hall's counsel presented the testimony of Ms. Hill, who was alive—contrary to the State's representation at the Writ of Actual Innocence Hearing.

146.    Ms. Hill testified that her trial testimony and identification of Mr. Hall were coerced by the Officer Defendants' threats, including that she would lose custody of her children if she did not identify Mr. Hall as the shooter.

147.    Edward Patterson also testified, corroborating that he, Gerald Patterson, and Debra Saunders had arrived at the scene of Mr. Dorsey's shooting after the fact and that they could not possibly identify who had shot Mr. Dorsey.

148.    After the contested hearing, on January 8, 2024, an ALJ ruled in Mr. Hall's favor, finding by clear and convincing evidence that he was innocent of Mr. Dorsey's murder and noting that the underlying conviction was a product of police misconduct.

149.    Among other things, the ALJ found that "Ms. Hill was a persuasive witness" and that "it [is] hard to believe [the City] cannot reach the same conclusion as I. There is no evidence tying the [Mr. Hall] to the murder of Mr. Dorsey and it was only through manipulating the witnesses and hiding the evidence that the City obtained a conviction in the first place."

H.   **The Impact of the Defendants' Misconduct on Mr. Hall's Life**

150.   Mr. Hall served more than 25 years in prison for a crime he did not commit. He was still on parole at the time he was exonerated. Arrested at 29 years old, he was 55 when he was finally released from prison and placed on parole.

151.   Because of Defendants' misconduct, Mr. Hall did not get to raise his children. He never got married, had the opportunity to pursue a career, or live his life dreams.

152.   Even in prison Mr. Hall was stigmatized for a crime he did not commit. After having trained the only successful service dog in the Veterans Service Dog Program, he was told he could not be featured in a news article because he was a convicted murderer.



153.   While in prison, Mr. Hall earned his GED and never got a single "ticket," a write-up for a violation.

154.    Everyday Mr. Hall spent incarcerated he experienced the threat of physical violence. He witnessed atrocities attendant with life in prison, including witnessing someone being murdered.

155.    Like many wrongfully convicted, particularly those who served significant time, Mr. Hall has mental health issues.

156.    Only a year after his exoneration, Mr. Hall remains unemployed while he cares for his widowed, elderly mother with dementia.

157.    While he tries to put the pieces of his life together in world that changed dramatically in the 25 years he was wrongfully imprisoned, he does the best he can to build a relationship with his children and grandchildren, who are overcoming their own trauma from growing up without a father that was falsely labeled a murderer.

158.    Mr. Hall's current physical, mental health, and medical problems are the direct result of his wrongful conviction and incarceration.

**I.     Mr. Hall's Story is Emblematic of BPD's Pattern and Practice of Unconstitutional Behavior**

159.    Defendants' constitutional violations causing Mr. Hall's wrongful conviction and incarceration are part of a longstanding pattern and practice of Defendant BPD's approach to homicide investigations and prosecutions. At the time of Mr. Hall's wrongful conviction and incarceration in 1992, and continuing for years afterwards, the practices described in this Compliant were widespread within the BPD and define a "custom or usage" of which the BPD had actual or constructive knowledge.

160.    Defendant BPD has long maintained a policy, practice, or custom of using coercive techniques in interviews and interrogations to obtain confessions and false statements, fabricating inculpatory evidence, withholding exculpatory and impeachment evidence from the SAO, defense

attorneys and judges, and, in bad faith, failing to conduct investigations in order to shield earlier wrongful acts in the course of homicide investigations.

161.    These practices were so sufficiently widespread that Defendant BPD knew or should have known that its officers engaged in such conduct. Nevertheless, it failed to stop such conduct, including refusing to investigate or discipline officers it knew or should have known had so abused their offices, thereby condoning, facilitating, and encouraging these unconstitutional practices.

162.    Despite actual or constructive knowledge that its officers required more training on their obligations regarding the disclosure of evidence, interactions with witnesses, and conducting homicide investigations, Defendant BPD failed to provide adequate training on these topics, perpetuating the unconstitutional conduct in Mr. Hall's case.

163.    BPD's history of unconstitutional conduct goes back to at least the 1960s with notable cases including, but not limited to Walter Lomax, Kirk Bloodsworth, Michael Austin, Wendell Griffin, Alfred Chestnut, Andrew Stewart, Ransom Watkins, Gary Washington, James Owens, Anthony Coleman, Jerome Johnson, Clarence Shipley, Sabein Burgess, Antoine Pettiford, Rodney Addison, Malcom Bryant, Tyrone Jones, Keith Davis, Rodney Brown, Paul Madison, Kenneth McPherson, Eric Simmons, and David Morris.

164.    For example, in 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. It was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. Rather than present all evidence to the prosecutors, the BPD officers presented incomplete

and fabricated reports. Mr. Lomax was granted a new trial based on these violations, and the State dismissed the charges.

165.    In 1974, Michael Austin was convicted of shooting and killing a private security guard. BPD officers, among other violations, failed to turn over to both prosecutors and the defense a non-identification of Mr. Austin by the eyewitness with the best direct view of the murder. BPD officers also failed to disclose that the same eyewitness again refused to identify Mr. Austin as having been one of the two perpetrators of the crime when they came back and showed the witness a second set of photographs containing at least one photo of Mr. Austin. BPD officers also failed to investigate other potential suspects and buried exculpatory evidence. The trial prosecutor later testified, "[H]ad I known then what I know now, I would have never prosecuted the case."

166.    In 1981, Wendell Griffin was convicted of the murder of James Wise. As part of that investigation, BPD homicide detectives engaged in substantial misconduct, including suppressing the results of two photo arrays shown to an important witness who had *not* identified Mr. Griffin; suppressing witness statements that excluded Mr. Griffin as the murderer; and failing to include material information in an affidavit for a search warrant for Mr. Griffin's car. Donald Kincaid, a BPD homicide detective, also coerced another key witness, Delores Queen, into falsely testifying by threatening her with a perjury prosecution and possible loss of her children if she did not "cooperate" with him. Det. Kincaid himself testified:

Q.    What if anything did you tell Delores Queen when you first picked her up?

A.    I told her I received certain information that she told she know [sic] about this homicide. And if she didn't cooperate with me, under the law and [with] the assistance of the State's Attorney's Office, I could summon her to the Grand Jury, have her put her testimony to the Grand Jury and I would come with the witnesses that gave me the information and this witness would testify. And if the Grand Jury felt she was lying, the State's Attorney's Office could bring perjury charges against her. If perjury charges were brought, she could be arrested and lose her children.

167.    In 1984, Alfred Chestnut, Andrew Stewart, and Ransom Watkins were wrongfully convicted of the murder of a 14-year-old. They were arrested as teenagers and spent a combined 108 years wrongly incarcerated. In 2019, evidence came to light that BPD officers—including Defendant Sargeant Barrick and the above mentioned Detective Kincaid—had coerced multiple middle school students into falsely implicating Mr. Chestnut, Mr. Stewart, and Mr. Watkins; coached the witnesses so their stories would match at trial; concealed their coercive conduct that had extracted the false statements; withheld witness statements that supported the teens' innocence; and deliberately failed to investigate—and later concealed—evidence identifying the likely perpetrator of the murder. In 2023, Defendant BPD settled Messrs. Chestnut's, Stewart's, and Watkins's § 1983 lawsuit for $48 million.

168.    In 1987, Gary Washington was convicted of murder. Twenty-five years later, it was discovered that BPD officers had procured the conviction by coercing false witness testimony and fabricating two statements, including one from a thirteen-year-old. The officers also suppressed exculpatory evidence, including evidence of their own misconduct during the investigation.

169.    James Owens' February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives had fabricated inculpatory evidence from the star witness and withheld evidence of several earlier, inconsistent statements made by that witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

170.    Also in 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In post-conviction proceedings, counsel for Mr. Coleman elicited testimony from the BPD detective investigating the homicide, Detective Sydnor, that BPD detectives used their discretion to decide which documents to share with state prosecutors. When

asked whether he forwarded copies of everything in his file to the prosecutor, Det. Sydnor responded that, "It depends on what it's about. Yeah, if it's pertinent to the investigation, yeah, I would. If it's something between me and another detective I may not."

171.    In a later exchange, Det. Sydnor answered affirmatively when asked, "isn't it fair to say that you do not always photocopy every information sheet and every set of notes that you take but, in fact, you usually concentrate on the ones that you believe are relevant to this offense?" The detective admitted that police did not copy and give to the prosecution everything in Anthony Coleman's case file—rather, the officers presented incomplete or falsified information to prosecutors. Later, during direct examination, the detective explained that "sometimes" he would have witnesses review his notes of their conversation, sign the notes, and adopt them. When witnesses gave "important" statements, he would write them down, but he did not document everything a witness told him. After determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel, the Court of Special Appeals (now Appellate Court of Maryland) vacated the judgment denying post-conviction relief and remanded Mr. Coleman's case for further proceedings.

172.    In the years following Mr. Hall's 1992 wrongful conviction, numerous other wrongful convictions occurred as a result of BPD's policy, pattern, and practice of misconduct in murder investigations, notably:

> a.   In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend due to BPD officers fabricating gunshot residue evidence and suppressing notes and other evidence of an alternate perpetrator, resulting in a federal jury awarding him $15 million in 1997;
>
> b.   Antoine Pettiford was wrongfully convicted of murder in 1995 and his plea was ultimately vacated after investigation revealed that BPD officers failed to disclose eyewitness statements and other exculpatory evidence;
>
> c.   In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it

was revealed that exculpatory witness statements had been withheld and the sole witness recanted her testimony at a postconviction proceeding.

d.   In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit and was exonerated in 2016 after evidence revealed that BPD officers fabricated witness identifications and failed to disclose several key pieces of evidence exculpating Mr. Bryant and pointing to another suspect, including undisclosed witnesses and witness statements.

e.   In 1999, Tyrone Jones was convicted of conspiracy to commit murder and during post-conviction, his counsel discovered evidence in the BPD file that the witness who identified Mr. Jones at trial had told a BPD officer that he had not seen the shooting or the murderer. Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production. Ultimately, Mr. Jones' conviction was vacated, and the state nolle prossed the charges against him.

173.   BPD Lieutenant Stephen B. Tabeling completed a report in 2000 about BPD's Homicide Unit as requested by then-BPD Commissioner Ronald L. Daniel. Lieutenant Tabeling's report found, among other things: there is "an apparent mutual lack of confidence and a serious divisive deficiency in teamwork" between the BPD and the SAO; BPD Homicide Detectives kept case folders in "abysmal condition—that is, when they can be located"; and homicide detectives lacked appropriate processes and protocols for recording information gathered during their investigations. On information and belief, these deficiencies dated to before and during the period when the Officer Defendants committed the misconduct in Mr. Hall's case.

174.   The BPD's policy, pattern, and practice of misconduct in murder investigations was perpetuated by the BPD's failure to train, supervise, and discipline its police officers, even though BPD knew or should have known that further training, supervision, and discipline was necessary. Instead, BPD sanctioned and facilitated the kind of misconduct that Defendants committed against Mr. Hall.

175.   For example, there was a failure to train police officers on disclosing evidence and complying with their obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Brady v.*

*Maryland*, 373 U.S. 83 (1963). A 2016 Report of the U.S. Department of Justice, Civil Rights Division concluded, "[t]his pattern or practice [of unconstitutional conduct] is driven by systemic deficiencies in BPD's policies, training, supervision, and accountability structures."

176.     Despite actual or constructive knowledge of the pattern of misconduct, including, but not limited to, the repeated failure to disclose exculpatory and impeachment evidence to the SAO, the defense, and on applications for warrants; the fabrication of evidence, including by improper interrogations; and cover-ups of misconduct during investigations, the BPD and its supervising officials did not act to remedy the abuses described in the preceding paragraphs. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Hall's injuries.

177.     These failures were a direct and proximate cause of the injuries suffered by Mr. Hall.

### FEDERAL CLAIMS

**Count I – 42 U.S.C. § 1983**
**Violation of Due Process (Fourteenth Amendment)**
**Fabrication of Evidence**
**(Against the Officer Defendants)**

178.     Each of the foregoing paragraphs is incorporated as if restated fully herein.

179.     The Officer Defendants by their conduct and under the color of state law fabricated evidence against Mr. Hall.

180.      The Officer Defendants performed the above-described acts in bad faith and under the color of state law, deliberately, recklessly and with indifference to Mr. Hall's constitutional rights and innocence. No reasonable officer in 1991 and 1992 would have believed this conduct was lawful.

181.     As a direct and proximate result of the fabrication of evidence, including Mr. Patterson's and Ms. Hill's false and coerced testimony, by the Officer Defendants, Mr. Hall suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer physical and emotional distress.

**Count II – 42 U.S.C. § 1983**
**Violation of Due Process (Fourteenth Amendment)**
**Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence**
**(Against the Officer Defendants)**

182.     Each of the foregoing paragraphs is incorporated as if restated fully herein.

183.     The Officer Defendants by their conduct and under the color of law deprived Mr. Hall of his constitutional rights to be free from deprivation of liberty without due process of law. The Officer Defendants jointly, and in conspiracy with one another and others, deliberately withheld exculpatory and impeachment evidence and, in bad faith, failed to adequately investigate the crime, including pursuing leads pointing to the true perpetrator. The Officer Defendants violated their clearly established duty to provide Mr. Hall's defense with all exculpatory and impeachment materials and to provide such materials as discoverable in post-trial motions. No reasonable police officer in 1991-1992 would have believed this conduct was lawful.

184.     Absent the misconduct of the Officer Defendants, the prosecution of Mr. Hall could not and would not have been pursued, and he would not have been convicted. The misconduct of the Officer Defendants directly led to the unjust and wrongful criminal conviction of Mr. Hall and his continuing wrongful imprisonment and deprivation of liberty. As a result, they denied him of his constitutional rights to be free from deprivation of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

185.     As a direct and proximate result of the violation of his constitutional rights to be free from deprivation of liberty without due process of law, Mr. Hall suffered injuries, including

but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer physical and emotional distress.

### Count IIII - 42 U.S.C. § 1983
### Malicious Prosecution – (Fourth and Fourteenth Amendment Rights)
### (Against the Officer Defendants)

186.     Each of the foregoing paragraphs is incorporated as if restated fully herein.

187.     In the manner described above, by their conduct and under the color of state law, the Officer Defendants caused Mr. Hall to be arrested, charged and prosecuted for the murder of Gerard Dorsey pursuant to a legal process that was unsupported by probable cause, thereby violating Mr. Hall's clearly established rights under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of unreasonable searches and seizures. No reasonable officer in 1991 and 1992 would have believed this conduct was lawful.

188.     The misconduct described in this Count was objectively unreasonable, and the Officer Defendants acting individually and in concert, intentionally, knowingly, and deliberately misrepresented the truth and withheld exculpatory and impeachment evidence from the SAO and Mr. Hall.

189.     This misconduct resulted in Mr. Hall's wrongful conviction. The proceedings ultimately, decades later, terminated in Mr. Hall's favor.

190.     As a direct and proximate result of the malicious prosecution by the Officer Defendants' malicious prosecution, Mr. Hall suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer physical and emotional distress.

**Count IV – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Against the Officer Defendants)**

191.    Each foregoing paragraph is incorporated as if restated fully herein.

192.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, each of the Officer Defendants stood by without intervening to prevent the violation of Mr. Hall's constitutional rights, although each of the Officer Defendants had the opportunity to do so.

193.    The misconduct described in this Count was objectively unreasonable and was undertaken in bad faith, intentionally, recklessly, and with willful indifference to Mr. Hall's clearly established constitutional rights.

194.    As a direct and proximate result of the Officer Defendants' failure to intervene to prevent the violation of Mr. Hall's clearly established constitutional rights, Mr. Hall suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

**Count V – 42 U.S.C. § 1983**
**Supervisory Liability**
**(Against Defendant Estate of John Barrick)**

195.    Each foregoing paragraph is incorporated as if restated fully herein.

196.    Defendant Sergeant Barrick was personally involved in the investigation of Mr. Hall, including interviewing Gerald Patterson on July 15, 1991 and August 22, 1991, where he learned from Mr. Patterson that Tyrone Rice witnessed the shooting, signing a report detailing that Rhonda Lisa Jones was present at the scene of the murder, interviewing Richard Covington on August 26, 1991, interviewing Carletta "Let" Smith on August 29, 1991, and testifying falsely at

Mr. Hall's criminal trial that Ms. Hill and Mr. Patterson were the only two eyewitnesses. Defendant Barrick directly supervised Defendants Licato and Barlow.

197.    Defendants Licato and Barlow acted with impunity in an environment in which they were not adequately supervised by Defendant Barrick, both in this case and as a matter of practice and custom. Defendant Barrick knew, or should have known, that Defendants Licato and Barlow were engaging in the unconstitutional conduct described above in the investigation of Mr. Dorsey's murder. Defendant Barrick knew, or should have known, that Defendants Licato and Barlow had previously engaged in similar unconstitutional conduct in the course of murder investigations. Defendant Barrick had the power to discipline the officers or take other action to prevent these abuses of power but failed to do so.

198.    Defendant Barrick acted recklessly and intentionally to Mr. Hall's constitutional rights by failing to adequately supervise Defendants Licato and Barlow, thereby allowing and causing those detectives to deprive Mr. Hall of his clearly established constitutional rights, including his right to be free from malicious prosecution and free from deprivation of liberty without due process of law.

199.    The reckless and deliberately indifferent conduct of Defendant Barrick violated his clearly established duty, in 1991-1992, to supervise the detectives, and no reasonable police supervisor in 1991-1992 would have believed that reckless supervision in the fact of actual or constructive notice of misconduct by their subordinate officers were lawful.

200.    As a direct and proximate result of Defendant Barrick's acts and omissions, Mr. Hall suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and he continues to suffer emotional distress.

## Count VI – 42 U.S.C. § 1983
### *Monell* Claim (Fourteenth Amendment)
### (Against the Baltimore Police Department)

201.    Each foregoing paragraph is incorporated as if restated fully herein.

202.    The actions the Officer Defendants were undertaken pursuant to policies that were ratified by policymakers with final policymaking authority and/or pursuant to persistent and widespread patterns of practice. These policies and practices included regularly failing to disclose exculpatory and impeachment evidence to the defense; fabricating evidence; improperly interrogating and coercing witnesses; and in bad faith failing to conduct investigations. Defendant BPD's illegal policies and practices also included the failure to adequately train police officers on their obligations regarding disclosure of exculpatory and impeachment evidence; fabrication of evidence; interrogations, and proper investigation; and failure to supervise and discipline police officers working on homicides who engaged in violations similar to those described above.

203.    These policies and practices were so widespread within the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge.

204.    The BPD policies, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policies, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers, is reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives and officers described above, and the testimony and reporting of BPD detectives and officers that these practices constituted the official or unofficial policies of the BPD.

205.    BPD maintained the policies and practices described in this Count with deliberate indifference to Mr. Hall's constitutional rights.

206.     The BPD is therefore liable for the misconduct committed by Defendants Barrick, Barlow, and Licato.

207.     As a direct and proximate result of the BPD's actions, Mr. Hall's constitutional rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and he continues to suffer emotional and physical distress.

## STATE LAW CLAIMS

### Count VII
### (State Law Malicious Prosecution)
### (Against the Officer Defendants)

208.     Each foregoing paragraph is incorporated as if restated fully herein.

209.     The Officer Defendants accused Mr. Hall of criminal activity knowing those accusations to be without genuine probable cause. The Officer Defendants instituted and continued the judicial proceedings.

210.     The Officer Defendants caused Mr. Hall to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

211.     The Officer Defendants fabricated evidence and withheld exculpatory and impeachment evidence that would have established Mr. Hall's innocence knowing that no true or reliable evidence implicated Mr. Hall in the murder of Mr. Dorsey.

212.     The Officer Defendants failed to investigate evidence that would have confirmed Mr. Hall's innocence.

213.     The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

214.     This misconduct resulted in Mr. Hall's wrongful conviction. The proceedings ultimately, decades later, terminated in Mr. Hall's favor.

215.    As a direct and proximate result of this misconduct, Mr. Hall suffered and continues to suffer injuries as set forth above, including physical injury and severe emotional and physical distress.

### Count VIII
### (Intentional Infliction of Emotional Distress)
### (Against the Officer Defendants)

216.    Each foregoing paragraph is incorporated as if restated fully herein.

217.    The acts and conduct the Officer Defendants as set forth above were extreme and outrageous. The actions of the Officer Defendants were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Hall, as more fully alleged above.

218.    As a direct and proximate result of the actions of the Officer Defendants Mr. Hall suffered and continue to suffer injuries as set forth above, including physical injury and severe emotional and physical distress.

### Count IX
### (Indemnification)
### (Against the Baltimore Police Department)

219.    Each foregoing paragraph is incorporated as if restated fully herein.

220.    Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for acts or omissions within the scope of their employment activities.

221.    The Officer Defendants are or were employees of the BPD who acted within the scope of their employment in committing the misconduct described in this Complaint.

222.    Accordingly, the BPD should be ordered to indemnify the Officer Defendants for any judgment entered against them in this matter and to pay such judgment to Mr. Hall.

WHEREFORE, the Plaintiff Anthony Hall prays that this Court grant:

(a)     Compensatory damages, attorney's fees, and costs against all Defendants, jointly

and severally;

(b)     Punitive damages against the Officer Defendants; and

(c)     Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff Anthony Hall demands a trial by jury under Fed. R. Civ. P. 38(b).


Dated:  April 18, 2024

> _____/s/ Barry J. Pollack_____
> Barry J. Pollack (Fed. Bar No. 12415)
> Julie Withers
> Katlin O'Brien
> HARRIS ST. LAURENT & WECHSLER LLP
> 1775 Pennsylvania Avenue, N.W., Suite 650
> Washington, D.C. 20006
> Telephone: (202) 617-5971
> Fax: (212) 202-6206
> bpollack@hs-law.com
> jwithers@hs-law.com
> kobrien@hs-law.com
>
> _____/s/ Kobie A. Flowers_____
> Kobie A. Flowers (Fed. Bar No. 16511)
> Neel K. Lalchandani (Fed. Bar No. 20291)
> Anthony J. May (Fed Bar No. 20301)
> Monique Gillum (_pro hac vice motion_ to be filed)
> BROWN GOLDSTEIN & LEVY LLP
> 120 East Baltimore Street, Suite 2500
> Baltimore, Maryland 21201
> Telephone: (410) 962-1030
> Fax: (410) 385-0869
> kflowers@browngold.com
> nlalchandani@browngold.com
> amay@browngold.com
> mgillum@browngold.com
>
> _Counsel for Plaintiff Anthony Hall_