## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ANTHONY HALL,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil No. 1:24-1137-RDB** |
| **BALTIMORE POLICE DEP'T,** *et al.,* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* 

### <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court regarding the parties' dispute about certain documents withheld by Plaintiff based on the attorney work product doctrine. This is the latest in a series of disputes between Plaintiff Anthony Hall ("Plaintiff" or "Mr. Hall") and Defendants Donald Licato and Frank Barlow (collectively, "Individual Defendants") and the Baltimore Police Department ("BPD") concerning documents created and maintained by non-party Mid-Atlantic Innocence Project ("MAIP"). As described in the undersigned's previous orders,[1] MAIP represented Mr. Hall for almost two decades in connection with his successful attempt to overturn his 1991 conviction for murder. *See Hall v. Balt. Police Dep't*, No. 24-1137-RDB, 2025 WL 509130, at *2-3 (D. Md. Feb. 13, 2025). On March 31,

---

[1] On September 17, 2024, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302, Judge Bennett referred this matter to me for "discovery and related scheduling[.]" ECF 46.

2025, after a conference call with counsel for the parties, the Court granted Defendants' request for in-camera review of Plaintiff's privilege log and invited submissions regarding whether any items deemed to be "fact work product" should be disclosed based on Defendants' "substantial need" and "undue hardship" as required by law. *Hall v. Balt. Police Dep't*, No. 24-1137-RDB, 2025 WL 1024069, at *1, *3 (D. Md. Mar. 31, 2025). Plaintiff submitted to the Court the challenged documents, and the parties filed brief letters addressing "substantial need" and "undue hardship." *See* ECFs 109 (Defendant's letter); 112 (Plaintiff's letter). Having conducted the in-camera review and considered the parties' arguments, the Court will GRANT IN PART Defendants' Motion to Compel disclosure as to one document and DENY IN PART the Motion as to all other documents.

## I.    BACKGROUND

In his complaint, Mr. Hall alleges that BPD and three former officers—Donald Licato, Frank Barlow, and John Barrick—concealed exculpatory evidence and coerced false witness testimony during Plaintiff's 1992 murder trial. Compl., ECF 1, at ¶ 7-9. This trial ended with a conviction for second-degree murder and the use of a firearm in the commission of a violent crime. *Id.* at ¶¶ 1, 12, 20. Defendants led the investigation in Plaintiff's case and, according to Plaintiff, "spoke to at least ten witnesses" including Nancy Hill ("Ms. Hill") and Gerald Patterson ("Mr. Patterson"). *Id.* at ¶¶ 37, 40, 69, 82. At trial, the Baltimore City State's Attorney's Office ("SAO") relied on, among other evidence, the testimony of

Ms. Hill, Mr. Patterson, BPD Officer Barrick (whose estate is named as a defendant), and BPD Officer Bruce Button. *Id.* at ¶ 103.

After spending more than thirty years in prison and on parole, Plaintiff filed a Petition for a Writ of Actual Innocence ("WAI") on June 11, 2021. *Id.* at ¶¶ 12, 14, 134. On March 15, 2023, the Circuit Court for Baltimore City granted the WAI, vacated Plaintiff's conviction, and ordered a new trial. *Id.* at ¶ 138. The State of Maryland later dismissed Plaintiff's case. *Id.* at ¶ 143. Plaintiff filed a petition with the State of Maryland Office of Administrative Hearings ("OAH") on June 30, 2023, pursuant to the Walter Lomax Act, "seeking compensation for the time he served in prison as a result of his wrongful conviction." *Id.* at ¶ 17. During the evidentiary hearing on Plaintiff's petition, the OAH Administrative Law Judge concluded that "Mr. Hall's conviction was secured by Defendants' coercion and misconduct to force [witnesses] to falsely incriminate him for [the victim]'s murder." *Id.*

The seeds for Mr. Hall's successful challenge originate with MAIP's efforts, as early as 2005, in investigating his conviction. *Id.* at ¶ 123. Plaintiff contends that MAIP's investigation revealed evidence that Defendants failed to disclose inconsistent witness statements and pressured witnesses, including Ms. Hall and Mr. Patterson, to identify Plaintiff as the perpetrator. *Id.* at ¶ 124-33. During its representation and investigation, MAIP employed a four-lawyer team, multiple legal directors, six outside counsel, six investigators, and more than a dozen interns and volunteers. *See* Affidavit of Shawn Armbrust, ECF 66-21 ("Armbrust Aff."), at

¶ 12.  MAIP's work included, among other things, obtaining and reviewing court and other public records, identifying and interviewing witnesses, researching legal issues, drafting investigative plans and memoranda, and communicating with Plaintiff and others concerning MAIP's representation.  *Id.* at ¶ 15.

Hotly contested in this case is the production of certain documents created or held by MAIP.  Through a series of phone calls and opinions, the Court has addressed several disputes regarding what, if any, documents created or maintained by MAIP should be produced to the Defendants.  *See Hall v. Balt. Police Dep't*, No. 24-1137-RDB, 2025 WL 1024069 (D. Md. Mar. 31, 2025); *Hall v. Balt. Police Dep't*, No. 24-1137-RDB, 2025 WL 509130 (D. Md. Feb. 13, 2025); *Hall v. Balt. Police Dep't*, No. 24-1137-RDB, 2024 WL 4278132 (D. Md. Aug. 24, 2024).  On January 3, 2025, Plaintiff produced a privilege log related to MAIP materials withheld from production and amended the same on January 10, 2025.  ECF 106, at 2.  As explained in the Court's most recent discovery order, Defendants challenge certain entries as being "fact work product" that should be disclosed.  *Hall*, 2025 WL 1024069 at *2.

## II.    LEGAL STANDARD

The work product doctrine confers a form of immunity from discovery upon documents that are prepared by an attorney and/or her agents in anticipation of litigation.  *See* Fed. R. Civ. P. 26(b)(3)(A)-(B); *see also United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (noting that the doctrine covers "material prepared by agents for the attorney as well as those prepared by the attorney himself").  Federal

courts recognize two types of work product: fact work product and opinion work product.  "Fact work product is a 'transaction of the factual events involved' and may be obtained upon a mere 'showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.'"  *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017) (citations omitted).  "Opinion work product, on the other hand, 'represents the actual thoughts and impressions of the attorney,' and it is 'more scrupulously protected.'"  *Ibid.*

The distinction is critical to discovery disputes.  Opinion work product "enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances."  *Id.*  Fact work product, however, "may be discovered when the seeking party shows both (1) substantial need for the information, and (2) the unavailability of a 'substantial equivalent' of the information to be discovered."  *Sanford v. Virginia*, No. 08-835, 2009 WL 2947377, at *2 (E.D. Va. Sept. 14, 2009) (first citing Fed. R. Civ. P. 26(b)(3)(A); and then citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 983-84 (4th Cir. 1992)).

Courts in the Fourth Circuit consider several factors in identifying a "substantial need" for fact work product.  Those include:

> (1) the importance of the materials to the party seeking them for case preparation; (2) the difficulty the party will have obtaining them by other means; and (3) the likelihood that the party, even if he obtains the information by independent means, will not have the substantial equivalent of the documents he seeks.

*Paice, LLC v. Hyundai Motor Co.*, 302 F.R.D. 128, 135 (D. Md. 2014) (internal

quotation marks and citation omitted); *accord E.I. Dupont de Nemours and Co. v.*

*Kolon Indus., Inc.*, 269 F.R.D. 600, 608-09 (E.D. Va. 2010) (quoting *Sanford*, 2009

WL 2947377, at *3); Fed. R. Civ. P. 26 advisory committee's note (1970).

## III.  ANALYSIS

For the following reasons, the Court finds that all but one document

submitted to the Court for in-camera review fall within the work product doctrine

and that Defendants are not entitled to production of those protected documents.

To the extent the documents are not opinion work product, Defendants fail to

demonstrate the substantial need and undue hardship necessary to pierce the

protection afforded to fact work product.

### A. *Relevant authority supports the conclusion that witness interview notes and memoranda are work product.*

The Court observes that all but one document—discussed further below—are

work product.  The information provided to the Court indicates that the challenged

documents concern witness interviews conducted by MAIP investigators.  Such

materials, prepared in connection with MAIP's legal representation of Mr. Hall, are

work product.  *See Nobles*, 422 U.S. at 238–39; *see also Sandra T.E. v. S. Berwyn*

*Sch. Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2010) ("Work-product protection applies

to attorney-led investigations when the documents at issue can fairly be said to

have been prepared or obtained because of the prospect of litigation." (internal

quotation marks and citation omitted)).  The closer question is whether such

materials are opinion work product or fact work product.  Distinguishing between

the two is often an "inherently and necessarily fact specific" endeavor. *United States v. Clemens*, 793 F. Supp. 2d 236, 252 (D.D.C. 2011).

The parties do not cite, and the Court is not aware of, binding Fourth Circuit authority discussing summary memoranda or handwritten notes regarding an investigator's interview of a witness. The Fourth Circuit's discussion in *In re Grand Jury Subpoena* supports the position that such materials may be opinion work product. In that case, the court addressed whether to "quash grand jury subpoenas demanding testimony of a criminal defendant's attorney and investigator." *In re Grand Jury Subpoena*, 870 F.3d at 315. Government counsel intended to ask defense counsel, among other things, "[w]hat did [the witnesses] tell you?" *Id.* at 318 (alteration in original). Relying on the seminal cases of *Hickman v. Taylor* and *Upjohn Co. v. United States*, the court held that this question called for opinion work product:

> In our view, *Upjohn* and *Hickman* make clear that a lawyer's recollection of a witness interview constitutes opinion work product entitled to heightened protections. **It does not matter whether an attorney draws on her memories, as opposed to written notes**, in recalling what was said; the **opinion-work-product privilege offers increased protection to both sources** because both require disclosure of the attorney's mental processes.

*In re Grand Jury Subpoena*, 870 F.3d at 317 (first citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981); and then citing *Hickman v. Taylor*, 329 U.S. 495 (1947)) (emphasis added). The court continued:

> As Justice Jackson explained in *Hickman*, 'Even if [an attorney's] recollection were perfect, the statement would be his language permeated with his inferences.' For most lawyers, imperfect recitations from memory of what a witness said would inevitably reveal what the attorney *deemed* important enough to remember.

> Accordingly, we draw a line between asking an attorney to divulge
> facts—either noticed by or communicated to her—and (as the
> government seeks to do here) asking an attorney to recall generally
> what was said in an interview. While it may be characterized as a
> "fact," the latter requires the attorney to expose her mental processes
> by revealing which witness statements she deemed important enough
> to commit to memory and is therefore opinion work product.

*In re Grand Jury Subpoena*, 870 F.3d at 317–18 (quoting *Hickman*, 329 U.S. at

516–17 (Jackson, J., concurring)) (alterations and emphasis in original).  As such,

courts within this circuit must "tread carefully when a party seeks to compel

disclosure of attorney work product, *whether memorialized in writing* or retained in

the recesses of an attorney's mind."  *In re Grand Jury Subpoena*, 870 F.3d at 317

(emphasis added).

No doubt, the specific circumstances in *In re Grand Jury Subpoena* differ

from those here.  But the reasoning of that case does not appear limited to its facts.

The court explained that the proposed question for oral testimony was "functionally

equivalent to the interrogatory the Court deemed improper in *Hickman*, which

asked the attorney to 'set forth in detail the exact provisions of any such oral

statement or reports [from witnesses].'"  *Id.* at 318 (quoting *Hickman*, 329 U.S. at

499).  The present circumstance is just a different version of the same strategy: a

request for disclosure of information provided by a witness (rather than the more

permissible inquiry as to what facts the attorney knows based on their

investigation).  The Fourth Circuit emphasized the protection of the opinion work

product serving as the source of the attorney's knowledge, regardless of its format.

Indeed, other circuits–bound, of course, by *Hickman* and *Upjohn*—have

concluded that notes and memoranda of a witness interview are opinion work

product.  The Eighth Circuit has long held that "[n]otes and memoranda of an attorney, or an attorney's agent, from a witness interview are opinion work product entitled to almost absolute immunity." *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) (first citing *In re Grand Jury Proceedings*, 473 F.2d 840, 848 (8th Cir. 1973); and then citing *Upjohn*, 449 U.S. at 399-400).  This is because "when taking notes, an attorney often focuses on those facts that she deems legally significant." *In re Green Grand Jury Proceedings*, 492 F.3d 976, 981-82 (8th Cir. 2007) (quoting *Baker*, 209 F.3d at 1054).

But, as noted above, some courts have been careful to examine the specific facts of circumstances rather than employ a rigid, categorical rule that discounts content or context of the asserted work product.  Courts in the D.C. Circuit examine, among other things, whether interview notes and memoranda have been "sharply focused or weeded" by counsel.  *In re Sealed Case*, 124 F.3d 230, 236 (D.C. Cir. 1997).  Documents that amount to "substantially verbatim witness statements" are not the sort of "sharply focused or weeded" material subject to near absolute immunity from production.  *See, e.g.*, *United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 429, 431-32 (D.D.C. 2014) (collecting authority).  Part of the "sharply focused or weeded" analysis considers who led the interview and thus generated its contents.  *See id.*  For this conclusion, *Landis* cited two cases where attorney memoranda captured, "nearly verbatim," witness statements provided during a Federal Bureau of Investigation interview (i.e., one not led and shaped by counsel).  *Id.* (first citing *United States v. Clemens*, 793 F. Supp. 2d at 252; and then

citing *In re HealthSouth Corp. Sec. Litig.*, 250 F.R.D. 8, 12-13 (D.D.C. 2008)).

"Conversely, when counsel 'selected witnesses to be interviewed, selected the topics

to be addressed with each witness, selected the documents to be shown to witnesses,

led the interviews, and asked the questions,' the memoranda were considered

opinion work-product." *United States v. Bertie Ambulance Serv., Inc.*, No. 14--53-F,

2015 WL 3932167, at *5 (E.D.N.C. June 25, 2015) (quoting *Landis,* 303 F.R.D. at

431–32); *accord Kogut v. Cnty. of Nassau*, No. 06-6695-JS-WDW, 2011 WL

13284713, at *4 (E.D.N.Y. Nov. 9, 2011) (refusing to order disclosure of information

about witness interviews connected to a wrongful conviction investigation because

"defense counsel's decisions as to which . . . individuals to interview constitute[d]

attorney work product").

     The Court remains mindful that, notwithstanding the aforementioned

concern about invading attorney (and attorney agents') thought processes, several

courts in this circuit analyze witness interview memoranda within the context of

fact work product and demonstrations of "substantial need" for the materials. *See

Black v. W. Va. State Police*, No. 22-0096, 2023 WL 415985, at *5 (S.D. W. Va. Jan.

25, 2023); *Bryant v. Trucking*, No. 11-2254-RBH, 2012 WL 162409, at *4–5 (D.S.C.

Jan. 18, 2012); *Sanford*, 2009 WL 2947377, at *4–7.  In some cases, parties have

reached differing conclusions regarding whether interview notes are opinion

product. *Compare Sanford*, 2009 WL 2947377, at *4 (parties agreed that the

witness interview memoranda were not opinion work product)*, with Bridges v. City

of Charlotte*, No. 16-564-GCM, 2017 WL 5715986, at *2 (W.D.N.C. Nov. 28, 2017)

(parties agreed that attorney notes taken during witness interviews were opinion work product). If nothing else, the non-uniformity on this issue underscores the fact-intensive nature of the analysis.

B. *The MAIP Documents*

Plaintiff's privilege log includes forty-three entries, which comprise ninety-four documents. Some entries consist only of one document, while others include as many as eight documents. The Court has reviewed the documents submitted by Plaintiff and summarizes them as follows:[2]

Entry 3 is a memorandum detailing attempts to visit five individuals at various residences in November 2019. There are no direct quotes from any of the witnesses. Rather, the only quote is from an individual who answered the door and stated that the person sought did not live at that residence. The memorandum includes impressions about the answering person's knowledge of those the investigators sought to interview. The memorandum also identifies potential witnesses who would be attempted at a different time.

Entry 5 is a handwritten document dated June 13, 2010 by an apparent potential witness. This written statement is signed by the declarant and two witnesses to his signature. The declarant states where he was on July 13, 1991 and what he saw or heard on that day.

Entry 9 is a January 30, 2015 memorandum summarizing attempts to

---

[2] Because Defendants narrowed the scope of their request to entries 3, 5, 9-19, 21-24, 26-28, and 35-44, ECF 109, at 1 n.1, the Court focuses on these entries only.

interview potential witnesses. The document summarizes information provided by several individuals. The quoted statements are from an individual who spoke about a potential witness's whereabouts and willingness to speak with MAIP personnel. That is, the quoted statements are not about the underlying facts at issue in this litigation. This memorandum also summarizes an interview with Ms. Hill, who the parties agree was a critical witness in the underlying murder trial and investigation relevant to this case. The document also includes impressions and opinions regarding the information and other evidence. The only quote from the Hill interview is her recollection of what a police officer said to her in 1991 regarding a suspect lineup. Entry 10 is similar to entry 9 in that it summarizes attempted witness interviews. The document summarizes information provided by two individuals—one concerning the underlying facts and the other concerning the whereabouts of an elusive witness. It also contains opinions about information provided by the interviewees.

Entry 11 summarizes an April 2015 interview with a potential witness, where the witness identified people who may be worth talking to. Entry 12 is another multi-witness interview memorandum. This memorandum has occasional quotes of a single word or adjective, rather than capturing complete sentences nearly verbatim. It includes the investigators' opinions regarding veracity and forthcomingness. Entry 13 is a July 16, 2015 interview memorandum regarding one witness. The document summarizes the information provided and includes the investigators' opinions about the conversation. Entry 14 is a July 2015 memorandum detailing a witness interview. It contains the same information as entry 12.

Entry 15 is a July 2015 memorandum about an interview with Mr. Hall's trial counsel from 1991. The interview appears to have involved discussion of legal strategy, and the memorandum includes the investigator's opinions about the discussion. Entry 16 is another multi-witness interview memorandum from July 2015. This summarizes interviews with three witnesses. The memorandum includes comments on adjustments to investigation strategy based on information received. Entry 17, like entry 16, is a multi-witness interview memorandum captured in August 2015. Interviewees include one of Mr. Hall's prior attorneys and an individual who may have been Mr. Patterson. The discussion with prior counsel included legal strategy. The discussion with "Mr. Patterson" involved the denial that the person was, in fact, Mr. Patterson (who both parties have attempted, unsuccessfully, to depose in this case). Other interviewees are included in this memorandum. As with all other documents (except entry 5), there are no extensive quotes of witness statements; there are, as with entry 12, occasional quotes of a handful of adjectives used by the declarants.

Entry 18 is a July 2016 memorandum summarizing an interview with a witness whose last name is not provided. Entry 19 is a February 2016 memorandum summarizing attempts to reach multiple witnesses. There are, again, no quotes in this document. It summarizes information provided by non-witnesses who answered the visited residences. Entry 21 is a November 2019 multi-witness interview memorandum, summarizing mostly unsuccessful attempts at contacting individuals. There is substantive discussion with an individual who denied seeing anything

13

relevant due to their late arrival to the murder scene.  Entry 22 is an August 2022 summary of a phone interview with an individual discussed in entry 21.

Entry 23 is an August 2022 memorandum summarizing a phone interview of Mr. Patterson conducted by the SAO and Conviction Integrity Unit ("CIU").  SAO personnel led the call.  The memorandum expressly disclaims that it is not verbatim, noting that the investigator did not take notes during the call and therefore drafted the memorandum from memory and included personal impressions.  The memorandum includes opinions about the interview and the witness.  Entry 24 is a November 2022 memorandum summarizing a phone interview with original trial counsel discussed in entry 15.

Entries 26, 27, and 28 are handwritten notes.  Entry 26 has a July 2015 date, while the other two are undated.  All appear related to interviews captured in memoranda described above.  The notes summarize the information provided, using brief phrases or summaries rather than the complete content.  The notes also appear to include questions that the investigator(s) intended to ask as well as opinions regarding veracity of statements (presumably, based on the investigator's knowledge of the file and other efforts).

Entry 35 is a September 2016 multi-witness interview memorandum, summarizing information from an individual whose last name is not identified as well as unsuccessful attempts to contact other individuals.  Entry 36 contains handwritten notes from a July 2015 interview that appears to be summarized in Entry 16.  Entry 37 is a March 2022 memorandum summarizing an interview with Mr. Patterson.

Entry 38 is another multi-witness summary memorandum, this time from February 2020. The memorandum describes unsuccessful attempts to visit potential witnesses as well as a phone call from an individual unhappy about attempts to contact them. Entry 40 is a January 2018 memorandum summarizing an interview. The document includes the investigator's opinions regarding veracity and possible future interviews by the CIU.

Entries 39, 41, 42, 43, and 44 are handwritten notes from interviews. All appear undated (except for entry 42), which has a marking on it that indicates a month and day but not a year. However, the interviewees are all individuals summarized in other memoranda; these may be the underlying notes serving as the basis for those memoranda. Of note, entry 44 appears to be signed by the interviewee; no other interview memorandum or interview notes were signed by the interviewee.

> C. *Except for entry 5, the Court denies the Motion to Compel because even if the materials are fact work product, Defendants fail to demonstrate a substantial need for all other documents.*

As an initial matter, because entry 5 was created by a declarant witness, the Court finds that this is not work product. Even if it was prepared upon the request of counsel, it is the verbatim statement of a non-party. *See Landis*, 303 F.R.D. at 432. Therefore, Plaintiff must produce entry 5 to Defendants.

As to the remainder, the notes, summaries, and memoranda created by MAIP investigators, under the direction of MAIP attorneys and in anticipation of post-conviction litigation, are work product. *See In re Grand Jury Subpoena*, 870 F.3d at 317; *Baker*, 209 F.3d at 1054; *see also 1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, No. 05-1670-LJM-WTL, 2007 WL 2904073, at *2 (S.D. Ind. May 18, 2007)

(holding that "documents created by [an investigator hired by a party or their counsel] during the course of [] litigation that reflect which potential witnesses [the investigator] has interviewed, the questions he chose to ask them, and his notes regarding their answers are classic work product"). Defendants do not appear to suggest otherwise; they focus, instead, on which type of work product it is and their ability to pierce work product protection. However, the Court need not resolve the question of whether the investigators' interview memoranda are opinion or fact work product. Even assuming they are fact work product—which is not a foregone conclusion, considering the language in *In re Grand Jury Subpoena* and approach in other courts cited above—Defendants do not demonstrate a substantial need for memoranda of statements provided almost two decades after the underlying incident and by individuals whose information does not appear to have changed in a manner meaningful to this case.

Guiding the Court's analysis are several observations. The "substantial need" demonstration "requires a showing of the relevance and importance of the document." *Suggs v. Whitaker*, 152 F.R.D. 501, 507 (M.D.N.C. 1993). As *Suggs* indicated, "special relevance and importance" attaches to statements made at or near the time of the underlying incident. *Id.* Such "contemporaneous statements have been deemed a unique catalyst in the search for truth." *Id.* (citing *Nat'l Union*, 967 F.2d at 985). They offer a window to a time unaffected by faded memories or the sort of re-evaluation and change that often accompanies reflection on an incident. *Suggs*, 152 F.R.D. at 507; *see also Bryant*, 2012 WL 162409, at *3

("[S]tatements made contemporaneously with the incident at question . . . are unique in that they provide an immediate impression of the facts.  A lapse of time itself may make it impossible to obtain a substantial equivalent of the material." (internal quotation marks and citation omitted)); *Coogan v. Cornet Transp. Co., Inc.*, 199 F.R.D. 166, 167 (D. Md. 2001) (finding substantial need for a witness statement taken at the scene of the accident because the statement captured the witness's immediate perception of said accident).  Conversely, "statements taken later . . . are more likely to contain information otherwise available to [the seeking party] through its own efforts to obtain statements or to take depositions."  *Nat'l Union*, 967 F.2d at 985.

Courts have found substantial need where a document "is necessary for impeachment purposes or to prevent fraud or misuse of the Court."  *Suggs*, 152 F.R.D. at 507-08 (citations omitted).  But such impeachment value "must be substantial because every prior statement has some impeachment value and otherwise the exception would swallow the rule."  *Id.* at 508 (citing *Gay v. P.K. Lindsay Co., Inc.*, 666 F.2d 710, 713 (1st Cir. 1981)).

Also, "'[d]iscovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.'"  *Nat'l Union,* 967 F.2d at 983 n.2 (quoting *Hickman,* 329 U.S. at 516 (Jackson, J., concurring)).  "As the Advisory Committee noted when enacting 26(b)(3) in 1970, the substantial need inquiry 'reflects the view that each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare

independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side.'" *Sanford*, 2009 WL 2947377, at *2 (quoting Fed. R. Civ. P. 26 advisory committee's note (1970)).

Based on these considerations, courts have taken care to distinguish between statements made "contemporaneous" to—for example, within a week of—the incident in question and those taken much later. For example, the *Bryant* court found a substantial need for a statement taken four days after the accident in question, where the request occurred more than two years after the accident. 2012 WL 162409, at *4. But the court did not find a substantial need for a statement taken "several months after the accident" because it was not contemporaneous and, therefore, "lack[ed] the unique value held by statements given close in time to an event." *Id.* at *4–5.

In *Black*, the court found a substantial need based on the passage of fourteen years since the statements contemporaneous to the underlying investigation and trial. 2023 WL 415985, at *5 (explaining that the underlying murder investigations took place between 2002 and 2008; the underlying trials occurred in 2008; and any deposition of the judge and defendants in 2023 could not provide the substantial equivalent of their contemporaneous notes during the trial proceedings). In an Eastern District of New York case, the passage of only a few months between the underlying incident and the recorded statements was enough to preclude finding of a substantial need. *See In re Petition of MDM Marina Corp.*, No. 13-597-ENV-VMS, 2013 WL 6711584, at *5 (E.D.N.Y. Dec. 18, 2013) (explaining that the relevant

incident occurred on July 5, 2012 and, accordingly, statements obtained between August and December 2012 were not sufficiently contemporaneous to demonstrate substantial need).

The circumstances of this litigation amplify the resistance to compel production of statements made well after the original criminal proceedings.  In these types of cases, a plaintiff brings a civil lawsuit years after overturning a wrongful conviction based on alleged unconstitutional conduct leading up to and during the original trial.  The relevant incidents in question are the original investigation and trial.  Therefore, the relevant timeframe for "contemporaneous" statements is not MAIP's post-conviction investigation; it is the time of the original investigation.  For that reason, the Court finds misplaced Defendants' arguments that faded memories or witness unavailability (due to death or another reason) is a basis to require disclosure of work product generated between 2015 and 2022.  The contentions in this case concern the Defendants' actions in and around 1991, the time of Mr. Hall's trial and conviction.  Setting aside recantations—which require additional consideration—the statements that are cloaked in "special relevance and importance" are those provided leading up to or at trial.  That is why *Black* preferred statements at the time of the underlying trials to one fourteen years later. *See* 2023 WL 415985, at *5.  To agree with Defendants, the Court would have to find some special relevance to statements made 25 years after the underlying incident; the reasoning of the "contemporaneous statement" jurisprudence compels the opposite conclusion where the witnesses made statements at or leading up to

the trial.

The Court's conclusion finds company among others that have examined
similar circumstances and identified the "unique catalyst" in the search for truth as
the statement made during the original investigation (unless the witness later
recanted).  *See Rubalcava v. City of San Jose*, No. 20-4191-BLF-VKD, 2022 WL
484988, at *7 (N.D. Cal. Feb. 16, 2022) (declining to find substantial need where,
among other things, "the work product at issue was developed during [the
plaintiff's] post-conviction habeas investigation . . . well after his wrongful
conviction in 2003 [and n]one of the disputed work product extend[ed] back to the
time of the crime . . . or [the original] trial").  In *Kogut*, the court denied in relevant
part a motion to compel disclosure of defense counsel's witness interviews where the
plaintiffs were convicted in 1984; convictions were vacated in 2003; and the one
plaintiff who was re-tried was acquitted in 2005.  2011 WL 13284713, at *1.
Addressing contentions similar to those advanced here, the court explained that the
"plaintiffs' argument regarding their substantial need for the documents–that 'given
the substantial passage of time in this case, many witnesses will have passed away,
disappeared, or experienced a failure of memory'–is unpersuasive as to the
documents created by the County attorneys during the investigation of this civil
litigation within the last few years."  *Id*. at *4.  So it is here, where the MAIP
documents were created within the last ten years regarding an incident that
occurred more than thirty years ago.  Therefore, a witness's unavailability or lack of
memory in 2024 or 2025 cannot, without more, demonstrate substantial need when

the work product at issue "was developed . . . well after [the] wrongful conviction,"
in this case, in 1991. *Rubalcava*, 2022 WL 484988, at *7.

If the witness recants, a different situation may arise. It would be not only
relevant but necessary to probe the recantation based on the allegations. But that
brings the Court to the remainder of the substantial need analysis: that a
substantial equivalent cannot be obtained absent undue hardship. *See* Fed. R. Civ.
P. 26(b)(3)(A)(ii). As Plaintiff's counsel observed, only one witness recanted—
Gerald Patterson. No doubt, Mr. Patterson has proven difficult for any party to pin
down: on March 26, 2025, the Court issued a show cause order for Mr. Patterson
based on his refusal to appear for deposition in this matter. *See* ECF 103. But the
Court does not find Defendants unable to obtain a substantial equivalent for the
following reasons.

First, Mr. Patterson's recantation is available. He submitted an affidavit in
connection with the state court proceedings vacating Mr. Hall's conviction. If Mr.
Patterson's statement to MAIP is consistent with the recantation, then the sworn
affidavit is available to Defendants. If his statement is consistent with his original
testimony (unlikely, given the allegations and developments in Mr. Hall's saga),
then the substantial equivalent exists in the original case file. Also, if the sworn
recantation is not enough, the record before the Court reflects that the SAO and
CIU interviewed Mr. Patterson in August 2022. Defendants have already obtained
the SAO's files connected to this case. The Court sees no reason why materials from
this interview would not be already in Defendants' possession or, if not in their

21

possession, obtainable from the SAO without undue hardship.

Second, Defendants do not demonstrate a substantial need for a statement for which they lack a substantial equivalent. That is, other than Mr. Patterson, there is no identification of a witness who either spoke to the police in 1991 or testified at the original trial who appears to have changed their statement. The fact that certain witnesses have not spoken to them, may not remember facts that go to the core of the case, or may be deceased does not confer special importance on statements made almost three decades after the original trial. Defendants seize on the language in *Suggs* about impeachment satisfying the substantial need burden. *See* 152 F.R.D. at 507-08. But if there is no indication that the testimony now—if any—would be substantively different, there can be no "substantial" impeachment value to the statements of forgetful or reluctant witnesses. Defendants have not provided anything more than "speculative or conclusory statements that the reports will contain invaluable impeachment material." *Id.* at 508. As *Suggs* explained, any prior statement has *some* impeachment value; hence, the Court's reference to "invaluable" or "substantial" impeachment material. The Court will abide by *Suggs*'s caution and not apply the impeachment exception in a manner that swallows the "substantial need" rule.

As to Mr. Patterson, there is no explanation why the recantations (or other statements) he provided to the SAO and other tribunals—*after the MAIP interviews*—could not be the substantial equivalent to the contents of MAIP documents. Again, Defendants have access to this material yet offer no explanation

22

how the MAIP materials might provide invaluable impeachment material not otherwise available from the existence of what the Court assumes to be conflicting statements to the Circuit Court for Baltimore City in this century and the last one. The Court appreciates that a party is hard pressed to argue what is in a document to which they lack access.  However, the circumstances of this case—the original trial and witness statements; the wrongful conviction proceedings and the witness recantations; and the availability of interviews with any recanting witness at or after the time of counsel's work product-protected interviews—persuade the Court that there is no substantial need as to Plaintiff's interview notes and memoranda of Gerald Patterson.

*    *    *

It is prudent to emphasize that the context of this case has a significant impact on the substantial need analysis.  The Court is mindful of Judge Bredar's caution in *Coogan* against the unsavory consequences of an overbroad application of the immunity afforded to fact work product:

> [I]t would not be reasonable to expect a layperson, injured [in an accident], to immediately hire an investigator or an attorney to record the contemporaneous statements of [the party allegedly responsible for the accident]. Indeed, a contrary decision would make it necessary for lawyers to approach injured persons in their hospital beds when they are at their most vulnerable, a practice that is widely condemned as unethical.

199 F.R.D. at 167–68.  The context of this case differs greatly, such that the Court's conclusions should not encourage such ill-natured behavior.  And, as *Coogan* noted, the unremarkable circumstance of attempting to get a statement contemporaneous to an accident differs from an adverse party "'riding to court on the enterprise of

another.'" *Id.* at 168 (quoting *Nat'l Union*, 967 F.2d at 984).

## IV.   CONCLUSION

For the foregoing reasons, the Court will GRANT IN PART Defendants'
Motion to Compel production of entry 5, a handwritten statement of a potential
witness; and otherwise DENY IN PART the Motion to Compel as to all other
documents identified in Plaintiff's privilege log.

A separate order consistent with this opinion will issue.

Date: May 30, 2025

                                        _____/s/_____
                                        Charles D. Austin
                                        United States Magistrate Judge

24